## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOYCE ILENE PUTERBAUGH, | CASE NO. 1:14-cv-01134-SHR-GBC |
| Plaintiff, | (JUDGE RAMBO) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | |
| | Docs. 1, 9, 10, 11, 12, 13 |

## REPORT AND RECOMMENDATION

### I.      Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Joyce Ilene Puterbaugh for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act").

Plaintiff was sixty-three years old on the date of the ALJ decision. (Tr. 126). She alleges that she is disabled because obesity and arthritis in her knees preclude her from performing the standing, walking, and lifting requirements of medium work. The regulations under the Act recognize that claimants over the age of sixty are less able to transition to other work. Thus, when claimants over sixty years old

are limited to light or sedentary unskilled work without transferable skills, they are found to be disabled. Consequently, the ALJ had to find that Plaintiff was capable of performing medium work, which is defined as standing or walking for six hours a day and lifting up to fifty pounds, in order to find that she was not disabled. Here, the ALJ concluded that Plaintiff could perform her past work as a cook, a medium-duty position.

At the hearing, the ALJ agreed to leave the record open for one week for Plaintiff to submit a residual functional capacity ("RFC") evaluation from her treating provider. Three days later, Plaintiff submitted the RFC evaluation. The evaluation indicated that Plaintiff could not perform medium work. However, the ALJ did not mention the RFC evaluation, and rejected Plaintiff's claims in part because no treating provider had opined that she was disabled. If the RFC evaluation was before the ALJ, and the ALJ ignored it, then the ALJ committed reversible error. If the ALJ did not review the RFC, then this evidence is new, pertains to the relevant time period, creates a reasonable possibility that the outcome could change, and was omitted for good cause.  As a result, the Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings so that the RFC assessment can be evaluated by the ALJ.

## II.     Procedural Background

On October 19, 2012, Plaintiff filed an application for DIB under the Act. (Tr. 113-16). On January 10, 2013, the Bureau of Disability Determination denied Plaintiff's application (Tr. 76-99), and Plaintiff filed a request for a hearing on February 5, 2013.  (Tr. 102-03). On January 15, 2014, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 48-75).  On January 27, 2014, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 10-23). On February 10, 2014, Plaintiff filed a request for review with the Appeals Council (Tr. 7-9), which the Appeals Council denied on April 14, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On June 12, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On August 25, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On October 8, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 11). On November 4, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 12). On November 13, 2014, Plaintiff filed a brief in reply. (Doc. 13). On June 23, 2015, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.     Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of*

*Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and requires only "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### IV.   Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.

1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on November 25, 1950 and was classified by the regulations as a person "closely approaching retirement age" through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 113). Plaintiff has eleven years of education with a GED and past relevant work as a donut maker and a cook. (Tr. 72).

### A. Evidence submitted to the ALJ

Plaintiff asserts disability as a result of bilateral knee pain, generalized non-specific arthritis, and fibromyalgia, which she alleges causes aches and pains throughout her body. (Tr. 54). She also indicated that she was trying to lose weight because her "doctor said it would be easier for [her] if [she] got some weight off." (Tr. 55). In a Function Report dated November 1, 2012, she indicated problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and using her hands. (Tr. 150). She explained that she could not go up or down stairs without using a handrail and going one step at a time. (Tr. 145).

At a hearing before the ALJ on January 15, 2014, she testified that she could carry a gallon of milk, but had to use two hands, and needed her husband to carry wrought-iron frying pans for her. (Tr. 65). She had earlier reported that she did not

lift anything heavier than five pounds. (Tr. 150). She testified and reported that she could not walk in malls or parks, but could walk around her home and to her mailbox, which was one hundred feet away. (Tr. 65, 148). She testified that she could not stand for more than five minutes, and gets stiff while sitting. (Tr. 66).

She testified and reported that she spends her day fixing meals, watching television, reading, and getting on the computer "once in a while." (Tr. 67, 149). She indicated that she could do laundry and dishes, but that her granddaughters come to her home and help her clean once per week to do "heavier stuff like mopping the floor, and they do [her] carpet when [her] carpet needs shampooing." (Tr. 67-68).  She reported that she had a dishwasher, so she did not need to stand while doing dishes. (Tr. 147). She indicated that she did not do yard work. (Tr. 148). She indicated that her husband was disabled, but that he was able to care for himself with regard to his daily activities. (Tr. 56). She testified that she could drive, but "getting in and out of the car sometimes is a little bit of problem." (Tr. 56). She reported that she shopped once every two weeks for forty-five minutes to get groceries. (Tr. 148).

She testified that she left high school after the eleventh grade because she got married, and most recently worked as a cook. (Tr. 55-60). She indicated that she had to stop working as a cook because her "knees had gotten gradually worse, and [she] had fell on one that [she] had operated on." (Tr. 60). She testified that she

began having problems with her left knee in June of 2013, when she "step[ped] down out of the living room onto the front porch, and something popped in [her] knee, and it was so loud that [her] husband heard it" and that she had been "having trouble with it ever since." (Tr. 63).

She testified and reported that she takes over-the-counter pain medications during the day, and hydrocodone, lorazepam, and amitriptyline at night. (Tr. 61-62, 152).  She testified and reported that she was unable to treat regularly for her impairments because she did not have insurance. (Tr. 60, 152).

In April of 2009, Plaintiff presented to Dr. John Bailey, M.D, an orthopedic specialist, with complaints of knee pain. (Tr. 206). X-rays indicated only mild degenerative arthritis, but an MRI indicated "an obvious degenerative tear" of the meniscus. (Tr. 205-06). On May 29, 2009, Plaintiff underwent an meniscectomy, and subsequently reported that her pain was "much improved." (Tr. 207, 209). She returned to work on June 22, 2009. (Tr. 207). On July 9, 2009, Plaintiff indicated that she had "some pain at the end of the long day but otherwise the knee has been [asymptomatic]." (Tr. 208). Dr. Bailey noted that "she most likely will have some discomfort at some point in the future due to the minor degenerative changes noted." (Tr. 208).

In May of 2010, Plaintiff presented to the emergency room at Williamsport Hospital after passing out at work. (Tr. 242). She complained of pain in her head,

and a CT scan of her cervical spine indicated "straightening of the cervical spine, with diffuse disc space narrowing and spondylosis." (Tr. 250). There was no evidence of a fracture or subluxation. (Tr. 250).

The medical records indicate that Plaintiff treated every six months with her primary care physician, Dr. Steven Yordy, M.D. (Tr. 178-93). In January of 2011, Plaintiff presented to Dr. Yordy complaining of right knee pain. (Tr. 194). She indicated that she could only sleep with a pillow under her right knee and with her knee slightly bent. (Tr. 194). She was prescribed Savella and referred to orthopedics and podiatry. (Tr. 195). X-rays indicated no "pathologic abnormality" of the right knee. (Tr. 196).

On January 27, 2011, Plaintiff was reevaluated by Dr. Bailey. (Tr. 200). She explained that she had "been having pain for the past 3 or 4 days" in her right knee that had "been relatively intense." (Tr. 200). On examination, she was "tender over around the patella and also over the medial joint line" with some swelling posteriorly. (Tr. 200). She had decreased range of motion in her knee, but range of motion in her hip did not appear to be painful. (Tr. 200). He reviewed Plaintiff's X-rays, and indicated that they showed "mild medial joint space narrowing" in the right knee compared to the left, a "slight" tilt to the patella, and "some mild irregularity" of the subchondral bone, but no significant hypertrophic changes. (Tr. 200). He assessed her to have "[right] knee medial compartment and

patellofemoral compartment osteoarthritis of mild to moderate severity" and performed an injection on her right knee. (Tr. 200). On February 17, 2011, Plaintiff followed-up with Dr. Bailey. (Tr. 199). She reported "that she continues to have a great deal of discomfort" in her right knee and that "the injection she received several weeks ago really has not helped at all." (Tr. 199). She received another injection and was instructed to follow-up if she did not make progress. (Tr. 199).

In May of 2011, she presented to Dr. Yordy with complaints in her right hand from water runoff at her job as a cook. (Tr. 192). On October 31, 2011, Plaintiff presented to Dr. Yordy with a tooth abscess. (Tr. 188). She was prescribed Amoxil and referred to dental care. (Tr. 188). At both visits, she had "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (Tr. 188, 192).

On June 26, 2011, Plaintiff presented to the emergency department at Williamsport Regional Medical Center. (Tr. 252). Plaintiff reported falling on her right knee. (Tr. 253). On examination, she had tenderness, swelling, and an abrasion in her knee. (Tr. 254). She complained of pain on weight bearing and her gait was not tested secondary to pain. (Tr. 256). She had an internal derangement of the right knee. (Tr. 252). She was diagnosed with a possible torn meniscus. (Tr. 252).  She was prescribed Vicodin, instructed to use crutches and an elastic wrap, and instructed not to work until she was evaluated at "work center." (Tr. 252).

Plaintiff stopped working on November 4, 2011. (Tr. 55-60). On December 28, 2011, she presented Bethany Engel, PA-C, a physician's assistant in Dr. Yordy's office. (Tr. 178). She was complaining of a cough, fatigue, post-basal drainage and a sore throat. (Tr. 178). Her chronic problems included depression, hypertension, hyperlipidemia, dyslipidemia, and osteoarthrosis, generalized, involving unspecified. (Tr. 178). Her medications included Advil, amitriptyline, aspirin, ativan, imitrex, Lipitor, Lortab, Vitamin D, and Zestoretic. (Tr. 178). She was prescribed cough medication and advised to return if additional symptoms arose. (Tr. 180).

On January 16, 2012, Plaintiff followed-up with Dr. Yordy. (Tr. 185). She reported "cramps in back off and on" that was "bearable" and was otherwise "doing pretty well overall." (Tr. 185). She had "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (Tr. 186).

On June 22, 2012, Plaintiff followed-up with Dr. Yordy. (Tr. 183). She reported that she was "doing well" and her review of systems was negative. (Tr. 183). She had "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (Tr. 183). Dr. Yordy indicated that Plaintiff's hypertension, hyperlipidemia, dyslipidemia, and osteoarthrosis were "stable." (Tr. 183). Her medications were continued. (Tr. 184).

On December 5, 2012, Plaintiff had a consultative examination with state agency physician Dr. Craig Nielsen, M.D. (Tr. 227). Plaintiff reported that she could not stand for more than five minutes. (Tr. 217). She explained that she had treated with a Dr. Oleginski, a rheumatologist, for fibromyalgia that caused burning in her hips, legs, and shoulders. (Tr. 217). She reported that he prescribed her amitriptyline[1] and lorazepam to treat her fibromyalgia. (Tr. 217). She indicated that Dr. Oleginski had moved to Geisinger Medical Center and transferred her care for fibromyalgia back to Dr. Yordy. (Tr. 217). Plaintiff explained that she did not see any other providers because she did not have insurance. (Tr. 218). She reported that she stopped working as a cook because she "couldn't be on [her] legs anymore." (Tr. 219). Dr. Nielsen observed paravertebral muscle spasm and decreased range of motion in her hands. (Tr. 220-22). Her examination was otherwise normal. (Tr. 221).

Dr. Nielsen opined that Plaintiff had absolutely no limitations in any work-related function. (Tr. 227). He opined that she could continuously bend, kneel, stoop, crouch, balance, climb, reach, handle, and finger. (Tr. 227). He opined that

---

[1]James A. Inman & Sandra L. Inman, *Fibromyalgia and the Americans with Disabilities Act: Overcoming Hurdles for Successful Litigation*, 13 Mich. St. U. J. Med. & L. 39, 44 (2009) ("Tricyclic antidepressants, such as amitriptyline and doxepin, have been used more than any other medication in the treatment of fibromyalgia to increase restful sleep and decrease pain and fatigue.") (citing CAROL S. BURKHARDT ET AL., GUIDELINES FOR THE MANAGEMENT OF FIBROMYALGIA SYNDROME PAIN IN ADULTS AND CHILDREN 1 (2005) at 27).

she did not need to be limited from heights, moving machinery, or other hazards. (Tr. 227). He opined that she had no limitation in lifting, carrying, standing, walking, sitting, pushing, or pulling. (Tr. 226). Specifically, he opined that she could continuously lift and carry up to 100 pounds and stand and walk for eight hours out of an eight-hour workday. (Tr. 226).

On December 17, 2012, Plaintiff followed-up with Dr. Yordy. (Tr. 269). She was complaining of a cough. (Tr. 269). She stated that she was doing well otherwise, but "doesn't have insurance currently so would like to defer labs until next year." (Tr. 269). On April 18, 2013, Plaintiff presented to Dr. Yordy with a cough. (Tr. 267). She also reported "fatigue and malaise." (Tr. 267). She was assessed to have sinusitis and prescribed zithromax. (Tr. 268).

On June 17, 2013, Plaintiff followed-up with Dr. Yordy. (Tr. 265). She stated that she twisted her left knee, that her husband "heard it crack," and that it "burns like fire," but she "doesn't have insurance." (Tr. 265). She reported that her pain was aggravated by stairs, bending, squatting, and straining. (Tr. 265). On examination, Plaintiff's neck showed lymphadenopathy. (Tr. 266). She had generalized tenderness, moderate swelling, and painful motion on flexion. (Tr. 266). Plaintiff was prescribed naproxen and instructed to elevate and ice her left knee. (Tr. 266).

On November 12, 2013, Plaintiff followed-up with Dr. Yordy. (Tr. 263). Plaintiff was concerned with swelling in her bilateral lower extremities and hands after a bus trip over the weekend. (Tr. 263). Plaintiff's medications were continued. (Tr. 264). On January 9, 2014, Plaintiff followed-up with Dr. Yordy with right ear pain, and was diagnosed with sinusitis. (Tr. 261). Her musculoskeletal system was not examined. (Tr. 261).

## B. RFC Assessment

On January 20, 2014, Vicki Brungard, LPTA, assessed Plaintiff's residual function capacity based on "grip dynamometer graphing, resistance dynamometer graphing, pulse variations, weights achieved, and selectivity of pain reports and pain behaviors." (Tr. 275). The assessment indicated that Plaintiff could lift seventeen pounds, carry up to eight pounds, walked with her left foot turned in and favoring her left side, was unable to kneel, was unable to complete a crawling activity secondary to pain in her knees, could sit for fifty-eight minutes, could stand for thirty minutes, and climbed stairs at a "significantly slowed" pace with a heart rate of 158 beats per minute. (Tr. 275-79). Ms. Brungard concluded that Plaintiff's testing was valid, defined as a safe level of effort that was not manipulated, and her dynamometer scores "demonstrated consistency." (Tr. 279-80). She opined that Plaintiff could sit for eight hours out of an eight hour workday, stand for three to four hours in an eight hour workday, and walk for one

to two hours over a "moderately short distance." (Tr. 280). She opined that Plaintiff could never kneel, and could perform other postural activities "minimally," which was defined as less than occasionally. (Tr. 280). She opined that Plaintiff could use foot controls occasionally, grasp and use her hands frequently, and rotate her head and neck occasionally. (Tr. 281). She opined that Plaintiff could lift and carry between eight and seventeen pounds occasionally and push and pull up to nineteen pounds occasionally. (Tr. 281). The RFC assessment was accompanied by graphs showing Plaintiff's performance on activities and pulse. (Tr. 282-86). On January 23, 2014, Plaintiff submitted the RFC assessment to the Office of Disability Adjudication and Review. (Tr. 274).

### C. ALJ Findings

On January 27, 2014, the ALJ issued the decision. (Tr. 20). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 4, 2011, the alleged onset date, and was insured through September 30, 2016. (Tr. 15). At step two, the ALJ found that Plaintiff's history of right knee medial meniscal tear, status-post arthroscopic surgery was medically determinable and severe. (Tr. 15). The ALJ found that her degenerative disc disease of the cervical spine was medically determinable, but not severe. (Tr. 15). The ALJ found that Plaintiff's alleged carpal tunnel syndrome and fibromyalgia were not medically determinable because the record did not show diagnoses for these

impairments. (Tr. 15). The ALJ found that Plaintiff's alleged degenerative disc disease of the left knee was not medically determinable because she received treatment only for her right knee. (Tr. 16). The ALJ found that Plaintiff's obesity was medically determinable, but not severe, because there was "no evidence that her weight has ever caused [Plaintiff] any significant functional limitations" and "she has been trying to lose weight." (Tr. 16).

At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 16). The ALJ found that Plaintiff had the RFC to perform:

> [A] range of medium work as defined in 20 CFR 404.1567(c) in which she can occasionally lift and carry up to 50 pounds and can frequently lift and carry up to 25 pounds. She can stand and/or walk for up to 6 hours in an eight-hour workday and can sit for at least 6 hours. She can frequently use ramps or stairs, can occasionally climb ladders, ropes or scaffolds, and can occasionally kneel, crouch or crawl. She should avoid concentrated exposure to workplace hazards, such as unprotected heights and dangerous moving machinery.

(Tr. 16). At step four, the ALJ found that Plaintiff could perform her past relevant work as a cook. (Tr. 19). Consequently, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 19-20). The ALJ specifically indicated that "[n]otably, none of the claimant's treating physicians has opined that she is disabled." (Tr. 19). The ALJ did not mention the RFC assessment. (Tr. 16-19).

## VI.    Plaintiff Allegations of Error

### A.    Evaluation of the medical opinions

Plaintiff asserts that the ALJ erred in failing to address the RFC assessment. The ALJ either received the RFC assessment, and did not mention it, or, more likely, did not receive the RFC assessment prior to issuing the opinion.

In *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), the Third Circuit set forth the standard for evaluating the opinion of a treating physician, stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer [v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones,* 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. The ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer,* 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See *Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318.

Defendant argues that "the ALJ considered the 'entire record,' including her January 20, 2014 physical therapist functional assessment, and accounted for all of Plaintiff's credible limitations in his RFC assessment (Tr. 16-19)." (Def. Brief at

14).   However, there is no evidence that the ALJ received or considered the RFC assessment prior to issuing the opinion. The ALJ did not list the RFC assessment in the Exhibit List to the decision. (Tr. 21-23), and stated that "[n]otably, none of the claimant's treating physicians has opined that she is disabled." (Tr. 19).

Regardless, assuming the ALJ received and considered the RFC assessment, the ALJ was required to explicitly mention the RFC assessment. As the Third Circuit has explained:

> [T]he Secretary must "explicitly" weigh all relevant, probative and available evidence. *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979); *see also Brewster v. Heckler,* 786 F.2d 581, 584 (3d Cir.1986); *Cotter,* 642 F.2d at 705. The Secretary must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *Brewster,* 786 F.2d at 585. The Secretary may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983)

*Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *see also Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504-05 (3d Cir. 2009) ("The ALJ must provide a 'discussion of the evidence' and an 'explanation of reasoning' for his conclusion sufficient to enable meaningful judicial review") (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000)); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

Defendant argues that "ALJs are not required to discuss every piece of evidence in the record." (Def. Brief at 16) (*Hur v. Barnhart*, 94 Fed.Appx. 130

2004 WL 817359, at *2 (3d Cir. 2004) ("[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record"); *Brumbaugh v. Colvin*, No. 3:14-CV-888, 2014 WL 5325346, at *11 (M.D. Pa. October 20, 2014) (quoting *Hernandez v. Comm'r of Soc. Sec.*, 89 Fed.App'x. 771, 774 (3d Cir. 2004) ("[W]here [ a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decisions, . . . the *Cotter* doctrine is not implicated.")); *Mays v. Comm'r of Soc. Sec*, 227 F. Supp. 2d 443, 448 (E.D. Pa. 2002) (quoting *Campbell v. Shalala*, No. 93-cv-0181, 1993 WL 452039 (E.D. Pa. Nov. 1, 1993)).

However, none of the cases cited by Defendant are binding on this Court. *See* CTA3 App. I, IOP 5.7 (Opinions published in the Federal Appendix "are not regarded as precedents that bind the court because they do not circulate to the full court before filing."). Moreover, the cases cited by Defendant do not apply to the RFC assessment, because the Regulations require ALJs to discuss *every* opinion by a physician, particularly treating physicians. Under the Regulations, 20 C.F.R. 404.1527(c) states that the ALJ "will evaluate every medical opinion we receive." *Id*. There is a heightened requirement in Section 1527(c)(2), which applies only to treating physicians. Section 1527(c)(2) states that ALJs "will *always give good reasons* in [the] *notice of determination or decision* for the weight we give your treating physician's opinion." *Id*. (emphasis added). *See also Ray v. Colvin*, 1:13-

CV-0073, 2014 WL 1371585, at *21 (M.D. Pa. Apr. 8, 2014) ("The cursory manner in which the ALJ rejected Dr. Jacob's opinions runs afoul of the regulation's requirement to " give good reasons" for not crediting the opinion of a treating source upon consideration of the factors listed above. While there may be sufficient evidence in the record to support the ALJ's ultimate decision that Plaintiff was not under a disability, and, thus, the same outcome may result from remand, the court cannot excuse the denial of a mandatory procedural protection on this basis.").

Defendant contends that the ALJ was not required to discuss the RFC assessment because it was from a physical therapist, not a physician. However, pursuant to SSR 06-3p, ALJs are required to evaluated medical opinions from non-acceptable sources using the same rubric as acceptable medical sources. *Id*. SSR 06-3p explains:

> The Regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider relevant opinions and other evidence from "other sources" listed in 20 C.F.R. 404.1513(d) and 416.913(d). With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources ... are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

> …
> The fact that a medical opinion is from an "acceptable source" ... may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" ..., depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source.
> …
> [T]he adjudicator generally should explain the weight given to opinions from these "other sources"…

*Id.*

Moreover, under Third Circuit case law, ALJs are also required to evaluate every third-party statement. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (Noting that "[i]n [*Van Horn v. Schweiker,* 717 F.2d 871, 873 (3d Cir.1983)], we stated we expect the ALJ to address the testimony of… additional witnesses").  Thus, if the ALJ received and rejected the RFC assessment without discussing it, the ALJ committed reversible error by rejecting it for "no reason" and without providing the explanation required by the Regulations. 20 C.F.R. 404.1527(c)(2); *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993).

Assuming the ALJ did not receive the RFC assessment, the assessment constitutes new and material evidence omitted for good cause, which precludes meaningful review and requires remand. Plaintiff submitted the RFC assessment to the Appeals Council, but the Appeals Council denied review. (Tr. 1-6). When the Appeals Council denies review, evidence that was not before the ALJ may only be

used to determine whether it provides a basis for remand under sentence six of section 405(g), 42 U.S.C. ("Sentence Six"). *See Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984); *Matthews v. Apfel*, 239 F.3d 589, 591-92 (3d Cir. 2001). Sentence Six requires a remand when evidence is "new" and "material," but only if the claimant demonstrated "good cause" for not having incorporated the evidence into the administrative record. *Id.* In order to be material, "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.* The relevant time period is "the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b); *Mathews*, 239 F.3d at 592. The materiality standard also "requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak*, 745 F.2d at 833. With regard to good cause, the Court in *Mathews* explained that:

> We should encourage disability claimants to present to the ALJ all relevant evidence concerning the claimant's impairments. If we were to order remand for each item of new and material evidence, we would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand. *See Szubak*, 745 F.2d at 834 ("A claimant might be tempted to withhold medical reports, or refrain from introducing all relevant evidence, with the idea of obtaining another bite of the apple if the Secretary decides that the claimant is not disabled.") (quotation omitted); *Wilkins,* 953 F.2d at 97 (Chapman, J., dissenting) ("By allowing the proceedings to be reopened and remanded for additional evidence, ... the majority is encouraging attorneys to hold back evidence and then seek remand for

> consideration of evidence that was available at the time of the ALJ
> hearing."). Instead, we believe that it is a much sounder policy to
> require claimants to present all material evidence to the ALJ and
> prohibit judicial review of new evidence unless there is good reason
> for not having brought it before the ALJ. Such a holding is
> instrumental to the speedy and orderly disposition of Social Security
> claims.

*Mathews*, 239 F.3d at 595.

The RFC evaluation is new and material. The ALJ specifically relied on an absence of treating source opinions to conclude that Plaintiff was capable to perform medium work. (Tr. 19). Thus, an RFC assessment that Plaintiff could not perform medium work is new and not cumulative. *Mathews*, 239 F.3d at 592. The ALJ specifically described the absence of an opinion from a treating source as "notabl[e]." (Tr. 19). The Regulations and Third Circuit case law, as described above, also place heavy emphasis on opinions from treating sources. *Id.* Thus, a treating source opinion that Plaintiff could not perform medium work raises a reasonable possibility that the outcome would be different. *Mathews*, 239 F.3d at 592.

Defendant asserts that the RFC assessment was not material because it was from a non-acceptable medical source. (Def. Brief at 20). However, as discussed above, opinions from non-acceptable medical sources must be considered using the same factors as medical sources and may even outweigh opinions from medical sources. SSR 06-3p; *Carole v. Colvin*, 14-1501, 2015 WL 4162446, at *2 (W.D.

Pa. July 9, 2015) (Classifying an opinion as a non-acceptable medical source means that it cannot "receive controlling weight, however, [that] does not mean that it is not entitled to consideration"). Defendant also asserts that the "physical therapist functional assessment is contrary to substantial evidence, which, as discussed above, demonstrated, inter alia, Plaintiff performed daily activities, lacked objective evidence to support her allegations of disabling impairments, and had minimal symptom complaints and treatment throughout the relevant period." (Def. Brief at 20). However, Plaintiff only had to establish that she was incapable of performing medium work, which requires lifting up to fifty pounds and being on her feet for six hours out of an eight-hour work day. None of her activities of daily living, which included housekeeping and doing the dishes, contradict her claim that she is unable to lift up to fifty pounds or that she is unable to stand or walk for six hours out of an eight-hour work day. (Tr. 145-54). *See Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001) ("Fargnoli's trip to Europe in 1988 cannot be the basis for a finding that he is capable of doing a light exertional job because sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity"); *Smith v. Califano,* 637 F.2d 968, 971-72 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. Smith's activities are miniscule when compared to a plethora of cases which have held that there was total disability even

when the claimant was far more active than Smith. It is well established that sporadic or transitory activity does not disprove disability.").

With regard to Plaintiff's treatment, SSR 96-7p provides that "the adjudicator *must not* draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id*. (emphasis added). Plaintiff repeatedly and consistently asserted that she was unable to undergo further treatment due to a lack of insurance. (Tr. 17, 60, 152, 218, 265, 269). However, there is no indication that the ALJ or Commissioner properly considered this explanation.

With regard to Plaintiff's "minimal symptoms," the Court notes that neither the ALJ nor Commissioner noted the objective findings from Plaintiff's consultative examination, namely muscle spasm and significantly decreased range of motion. (Tr. 18-19, 215-27). Objective evidence also indicated that Plaintiff is obese. (Tr. 220-27).

With regard to Plaintiff's fibromyalgia, the ALJ wrote that Plaintiff's fibromyalgia was "not definitively diagnosed in the record. There are no notes indicating any treatment specific for this condition. In fact, this condition is only

mentioned by reference by the consultative examiner, who pointed out that he elicited no pain response from the claimant when he palpated the classic tender points on examination." (Tr. 15). However, contrary to the ALJ's assertion, there are consistent treatment notes showing treatment for fibromyalgia, namely, amitriptyline. Plaintiff explained to Dr. Nielsen that she had treated with a Dr. Oleginski, a rheumatologist, for fibromyalgia that caused burning in her hips, legs, and shoulders. (Tr. 217). She reported that he prescribed her amitriptyline and lorazepam to treat her fibromyalgia. (Tr. 217). "Tricyclic antidepressants, such as amitriptyline and doxepin, have been used more than any other medication in the treatment of fibromyalgia to increase restful sleep and decrease pain and fatigue." James A. Inman & Sandra L. Inman, *Fibromyalgia and the Americans with Disabilities Act: Overcoming Hurdles for Successful Litigation*, 13 Mich. St. U. J. Med. & L. 39, 44 (2009) (citing CAROL S. BURKHARDT ET AL., GUIDELINES FOR THE MANAGEMENT OF FIBROMYALGIA SYNDROME PAIN IN ADULTS AND CHILDREN 1 (2005) at 27)).  The ALJ's failure to recognize that Plaintiff's amitriptyline was treatment for fibromyalgia undermines his conclusion with regard to whether it was medically determinable.

With regard to Plaintiff's left knee, the ALJ wrote the "the records only reference treatment for the right knee." (Tr. 16). Again, the ALJ mischaracterized the record. On June 17, 2013, Plaintiff followed-up with Dr. Yordy. (Tr. 265). She

stated that she twisted her left knee, that her husband "heard it crack," and that it "burns like fire," but she "doesn't have insurance." (Tr. 265). She reported that her pain was aggravated by stairs, bending, squatting, and straining. (Tr. 265). On examination, Plaintiff's neck showed lymphadenopathy. (Tr. 266). She had generalized tenderness, moderate swelling, and painful motion on flexion in her left knee. (Tr. 266). Plaintiff was prescribed naproxen and instructed to elevate and ice her left knee. (Tr. 266). Thus, the record plainly shows treatment for Plaintiff's left knee pain. Moreover, this treatment note is entirely consistent with Plaintiff's testimony, where she stated that she began having problems with her left knee in June of 2013, when she "step[ped] down out of the living room onto the front porch, and something popped in [her] knee, and it was so loud that [her] husband heard it" and that she had been "having trouble with it ever since." (Tr. 63).

The ALJ notes that, in January of 2011, X-rays of Plaintiff's right knee were normal. (Tr. 18). However, the ALJ fails to note that, prior to her surgery in 2009, X-rays of her knee were also normal. (Tr. 205-06). An MRI was needed to discern the meniscal tear that was corrected with surgery. *Id.* After this surgery, Dr. Bailey noted that "she most likely will have some discomfort at some point in the future due to the minor degenerative changes noted." (Tr. 208). The ALJ writes that Plaintiff asserts she became disabled "on November 4, 2011 [but the] record does not contain any treatment notes pertaining to the claimant's medical condition at

that time." (Tr. 17). The ALJ then cites Plaintiff's December 28, 2011 follow-up
for a cough. *Id.*

However, the ALJ fails to mention Plaintiff's June, 2011 hospitalization
after falling on her right knee. On June 26, 2011, Plaintiff presented to the
emergency department at Williamsport Regional Medical Center. (Tr. 252).
Plaintiff reported falling on her right knee. (Tr. 253). On examination, she had
tenderness, swelling, and an abrasion in her knee. (Tr. 254). She complained of
pain on weight bearing and her gait was not tested secondary to pain. (Tr. 256).
She had an internal derangement of the right knee. (Tr. 252). She was diagnosed
with a possible torn meniscus. (Tr. 252).  She was prescribed Vicodin, instructed to
use crutches and an elastic wrap, and instructed not to work until she was evaluated
at "work center." (Tr. 252). The ALJ does not mention this hospitalization at all.
Nor does the ALJ mention Plaintiff's treatment with Dr. Bailey in January and
February of 2011, where she also demonstrated swelling and tenderness, and
received multiple injections. (Tr. 16-19, 199-200). This is also entirely consistent
with Plaintiff's testimony, as she testified that she had to stop working as a cook
because her "knees had gotten gradually worse, and [she] had fell on one that [she]
had operated on." (Tr. 60). With regard to Plaintiff's January 14, 2011 follow-up
with Dr. Yordy, the ALJ writes that "the note contains no examination findings or
treatment recommendations." (Tr. 18). However, this note plainly shows a

Case 1:14-cv-01134-SHR   Document 16   Filed 08/05/15   Page 29 of 31

prescription for Savella and referral to Dr. Bailey, who then treated Plaintiff with multiple injections. (Tr. 194-200). The ALJ's mischaracterization of the record and omission of key treatment notes further emphasizes the materiality of the RFC assessment.

Plaintiff identified significant symptoms and objective findings in the RFC assessment. This does not mean the RFC assessment is "contrary" to the evidence; it may be the best evidence of debilitating impairments. The contrast itself demonstrates the materiality of the RFC assessment. The appropriate stage to determine whether the RFC assessment is contrary to the evidence or supports Plaintiff's claim is before the ALJ, not on review by the Court. Plaintiff does not need to prove that the outcome will change, she only needs to show a "reasonable possibility." *Mathews*, 239 F.3d at 592.  Here, the RFC assessment provides reasonable possibility that the outcome would be different.

Defendant does not challenge Plaintiff's argument that the RFC assessment was omitted for good cause. The Court concludes that the RFC assessment was omitted for good cause, namely, reliance on the ALJ's assurance that it would be received and considered if submitted prior to January 29, 2014. (Tr. 74). Thus, the Court recommends remand for the ALJ to properly evaluate the RFC assessment as new and material evidence omitted for good cause and properly assess Plaintiff's

Page **29** of **31**

RFC. Because the Court recommends remand on these grounds, the Court declines to address Plaintiff's other allegations of error.

## VII.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance and supplemental security income benefits be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the

findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 5, 2015                                    s/Gerald B. Cohn
                                                 _____
                                                        GERALD B. COHN
                                              UNITED STATES MAGISTRATE JUDGE